In re NATIONAL FORGE COMPANY, et al., Debtors.

Official Committee of Unsecured Creditors of National Forge Company, Movant,

v.

E. Roger Clark both Individually and as an Officer and Director of National Forge Company; Maurice J. Cashman, both Individually and as an Officer and Director of National Forge Company; Dana Beyeler, both Individually and as an Officer of National Forge Company; Robert A. Kaemmerer both Individually and as an Officer of National Forge Company; Daniel Antos; William D. Bailey; Richard A. Brewster; James E. Caldwell; Larry Campbell; James C. Confer; Richard D'Alessandro; Donald Fissel; James B. Harris; Thomas H. Jackson; Ashok K. Khare; Carl J. Luppino; Clarence E. Mason; Harold Murphy; Philip R. Novosel; Charles R. Olson; James D. Ruhlman; Phillip R. Simons; Glenn E. Turk; Ronald L. Young; Barry Zischkau; J.P. Morgan Chase & Co., as a Lender and an Agent on Behalf of Certain Lenders under Various Amendments to Amended and Restated Credit Agreement Dated April 6, 1998; Fleet Business Credit Corporation; and National City Bank of Pennsylvania, Respondents.

No. 02–10488.

United States Bankruptcy Court, W.D. Pennsylvania.

Jan. 29, 2004.

David A. Murdoch, Pittsburgh, PA, Guy C. Fustine, Erie, PA, for Debtors.

David W. Lampl, Pittsburgh, PA, for Official Committee of Unsecured Creditors.

Lawrence C. Bolla, Erie, PA, for Official Committee of Retirees.

Douglas A. Campbell, Pittsburgh, PA, for Dana Beyeler, Maurice J. Cashman, E. Roger Clark, and Robert J. Kaemmerer.

Brian M. McGowan, Erie, PA, for Daniel Antos, William D. Bailey, Richard A. Brewster, James E. Caldwell, Larry Campbell, James C. Confer, Richard D'Alessandro, Donald Fissel, James B. Harris, Thomas H. Jackson, Ashok K. Khare, Carl J. Luppino, Clarence E. Mason, Harold Murphy, Philip R. Novosel, Charles R. Olson, James D. Ruhlman, Phillip R. Simons, Glenn E. Turk, Ronald L. Young, and Barry Zischkau.

Joel M. Walker, Pittsburgh, PA, for J.P. Morgan Chase & Company, Fleet Business Credit Corp. and National City Bank of Pennsylvania.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

National Forge Company ("NFC"), National Forge Holdings, Inc. ("NFC Holdings"), and National Forge Components, Inc. ("NFC Components") (collectively referred to as "Debtor") filed voluntary Petitions for relief under Chapter 11 of the Bankruptcy Code on March 6, 2002 (the "Filing Date"). By Order dated March 12, 2002, the three cases were consolidated for joint administration under the National Forge Company case at Bankruptcy No. 02–10488.

On January 31, 2003, the Official Committee of Unsecured Creditors ("Creditors' Committee") filed an Adversary Complaint at Adversary No. 03–1014 (the "Complaint"). In its Complaint, the Creditors' Committee asserts fraudulent transfer claims against certain of the Debtor's bank lenders, officers, directors, and shareholders, which arise from a stock redemption transaction that occurred in 1999 (the "Redemption Transaction"). Before the Court is the EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF UNSE-

CURED CREDITORS FOR ORDER CLARIFYING THAT IT HAS THE AUTHORITY TO INVESTIGATE, ASSERT, PURSUE AND SETTLE, ON BEHALF OF THE DEBTORS' ESTATES, CERTAIN CLAIMS AND CAUSES OF ACTION, OR, ALTERNATIVELY, TO GRANT SUCH AUTHORITY (the "Motion"). The Creditors' Committee asserts that it either had authority to file the Complaint under prior orders of Court or, in the alternative, that it should be granted such authority *nunc pro tunc* as of January 31, 2003, the date of the filing of the Complaint. The Respondents to the Motion are the same parties named as Defendants in the Complaint. They assert that the Creditors' Committee lacks standing to file the Complaint; that there is no valid reason for the Court to grant the Creditors' Committee *nunc pro tunc* relief; that the Complaint is barred by the Doctrine of Judicial Estoppel; and that the Creditors' Committee's pursuit of this cause of action constitutes a material change to the confirmed Plan of Reorganization that could significantly reduce the unsecured creditors' recovery which requires re-balloting.

A hearing on the Motion was held on April 1, 2003. Decision was deferred pending resolution of the *Cybergenics* case which was before the Court of Appeals for the Third Circuit for en banc review. *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (en banc) (hereinafter "*Cybergenics*"). After *Cybergenics* was decided, we entertained further argument. By Order dated November 26, 2003, the Creditors' Committee was granted the authority to assert, pursue and/or settle those claims raised in the Adversary Proceeding filed by the Committee against the Banks and certain other individual Defendants *nunc pro tunc* to January 31, 2003. We write to explain the rationale of our decision.

*Factual Background*

Debtor filed its bankruptcy Petition on March 6, 2002. On that same date, Debtors sought an emergency hearing on numerous motions including a MOTION FOR THE ENTRY OF AN INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 364(c) AND (d) AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING DEBTORS TO OBTAIN INTERIM POST–PETITION FINANCING, GRANTING SENIOR LIENS AND PRIORITY ADMINISTRATIVE EXPENSE STATUS, AND AUTHORIZING DEBTORS TO ENTER INTO AGREEMENTS WITH JP MORGAN CHASE BANK, AS LENDER AND AGENT, (ii) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. S363, (iii) PRESCRIBING FORM AND MANNER OF NOTICE AND TIME FOR FINAL HEARING UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(c), AND (iv) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363, AND 364 (the "Postpetition Financing Motion"). An emergency hearing was fixed for March 11, 2002.

As part of the Postpetition Financing Motion, Debtors admitted that they were "justly indebted to the Prepetition Banks, without defense, counterclaim or offset of any kind..." and that the Debtors' prepetition loans are secured by "valid, duly perfected, first priority...non-avoidable, enforceable liens...in substantially all of the Debtors' assets...." An Order was entered on March 12, 2002 which granted the Postpetition Financing Motion on an interim basis (the "Interim DIP Order").

The Interim DIP Order provides the Creditors' Committee 90 days to "proper-

ly" file an Adversary Proceeding to challenge the validity, enforceability or priority of the Bank's security interest and liens or otherwise assert any claims or causes of action. In the absence of the filing of a timely Adversary Proceeding, the Creditors' Committee would be bound by the Debtors' admissions.

A further hearing was held and the Interim DIP order was made final by an Order dated April 2, 2002 ("Final DIP Order"). The Final DIP Order extended the time for action by the Creditors' Committee from 90 to 120 days.

On July 18, 2002, the Creditors' Committee and JP Morgan Chase Bank ("JPMorgan") as lender and agent (the "Agent") for the participating banks (together with JPMorgan, the "Banks") filed the first of a series of Stipulations for extension of the 120 day deadline.

Each of the Stipulations provides that the Creditors' Committee's investigations with respect to possible claims or avoidance actions against the Banks was still proceeding and extended the time for filing any claim or action against the Banks. The fifth and final Stipulation extended the time for action until January 31, 2003.

On November 27, 2002, National Forge Company ("NFC") and National Forge Components ("NFC Components") ("NFC" and "NFC Components" together, the "Proponents") filed a JOINT PLAN OF LIQUIDATION DATED NOVEMBER 27, 2002, FOR NATIONAL FORGE COMPANY AND NATIONAL FORGE COMPONENTS, INC. ("Plan") and a related Disclosure Statement ("Disclosure Statement"). The Proponents subsequently filed an AMENDED JOINT PLAN OF LIQUIDATION DATED NOVEMBER 27, 2002 FOR NATIONAL FORGE COMPANY AND NATIONAL FORGE COMPONENTS, INC. ("Amended Plan") and a related Disclosure Statement in Support of Amended Joint Plan of Liquidation ("Amended Disclosure Statement").

The Disclosure Statement provides that the third Debtor in this case, NFC Holdings, ("Holdings") is not a party to the Plan and provides that "Holdings has determined that it is not able to propose a confirmable plan of reorganization and will file a motion to dismiss its Chapter 11 case." Pursuant to the Amended Plan, the Proponents contemplated the sale of substantially all of the Debtor's assets and substantive consolidation of the cases. The sales proceeds and any remaining assets, claims and causes of action would revest in an entity known as Liquidating NFC for distribution to creditors. Liquidating NFC would acquire all of the remaining assets including any "Rights of Action." [1]

The Amended Plan also proposed releases of, among others, NFC and NFC Components, their Banks, affiliates and shareholders, directors, principles, partners, officers, employees, agents, repre-

---

1. Right of Action is defined in the Plan as a claim, demand, right, defense, action, cause of action, suit, damage, offset, power, or privilege of any kind or character whatsoever, known or unknown, suspected or unsuspected, whether arising prior to, on, or after the Petition Date, in contract or in tort, at law or in equity, or under any other theory of law, held by NFC or Components against any Person, including but not limited to: (I) all avoidance powers, actions, rights, or remedies under Sections 544 through 553 and 724 of the Bankruptcy Code or any similar or related law; (ii) any other powers, actions, rights, or remedies arising under other sections of the Bankruptcy Code; (iii) rights of setoff, counterclaim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (iv) the right to object to Claims, pursuant to Section 502(a) of the Bankruptcy Code; and (v) such claims and defenses as fraud, mistake, duress, and usury.

sentatives and professionals ("Released Parties") from:

any and all claims (as defined in Section 101(5) of the Bankruptcy Code), obligations, suits, judgments, damages, rights, causes of action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, that NFC, Components, their Estates, or the Creditors' Committee is entitled to assert in its own right or on behalf of the holder of any Claim or Interest or other Person, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or prior to the Effective Date.

The Amended Disclosure Statement identifies Debtors' management and key Employees as:

E. Roger Clark, Chairman, President and CEO; Maurice J. Cashman, Vice President, Treasurer, Secretary and CFO; Robert A. Kaemmerer, Assistant Treasurer and Assistant Secretary; Dana A. Beyeler, Vice President and Director of Marketing and Quality.

The Amended Plan and Amended Disclosure Statement contemplate that Liquidating NFC will act through a "Responsible Officer." The Responsible Officers were subsequently identified as Maurice J. Cashman and Robert A. Kaemmerer.[2]

The Amended Plan and Amended Disclosure Statement provide that any "Rights of Action" that NFC or Components may hold vests in Liquidating NFC and that Liquidating NFC may commence and pursue such Rights of Action as appropriate.

The Amended Disclosure Statement puts all parties who have received a transfer or money or property of the Proponents or who has transacted business with the Proponents on notice that they should assume that such transfer or transaction may be the subject of an action post-confirmation.

The Order approving the Amended Disclosure Statement provides that the Confirmation Order shall not bar Liquidating NFC by *res judicata*, collateral estoppel, or otherwise from collecting, prosecuting or otherwise defending any matter or Rights of Action.

The Creditors' Committee raised numerous objections to the original Plan and Disclosure Statement, most of which were addressed in the Amended Plan and Amended Disclosure Statement. One of the Creditors' Committee's original objections was that the Disclosure Statement fails to disclose that an action may exist against certain insiders of NFC related to payouts on stock redemption prior to the Filing Date. The Proponents' response seemingly resolves the issue. They responded that the Disclosure Statement does not contain a discussion of the potential action that the Creditors' Committee refers to because such action is property of Holdings, which is not a party to the Plan and Disclosure Statement. The Proponents further respond that such cause of action, if it has any merit, will not be affected by the Plan.

A continued hearing to consider approval of the Amended Disclosure Statement was held on January 15, 2003. At the hearing, counsel for the Creditors' Committee noted that the Amended Plan will preserve avoidance actions. The Amended Disclosure Statement was approved by Order dated January 15 and a hearing on

---

**2.** Cashman and Kaemmerer were named in the Order dated April 30, 2003 which confirmed the Amended Joint Plan of Liquidation.

confirmation of the Amended Plan was fixed for February 28, 2003.

Prior to the scheduled confirmation hearing, the Creditors' Committee filed the Complaint. The Banks, the union, and the Creditors' Committee filed objections to confirmation.

By the time of the confirmation hearing, the sale of Debtor's assets had closed and the Banks had been paid in full. In the Complaint, the Creditors' Committee asserts that the Banks lent money to Debtors as part of an alleged fraudulent transfer. The Banks objected to confirmation on the basis that they will incur fees in defense of the Complaint; that they are entitled to recover the fees under their loan documents; and the Amended Plan fails to provide for payment of those fees. The Debtor and the Retirees' Committee responded that the Bank's defense of the fraudulent conveyance action is outside the scope of the indemnification provisions of the loan documents and the Banks are not entitled to recover legal fees to defend the Complaint.

The Creditors' Committee objected to the language in the Amended Plan that provides that Liquidating NFC shall have authority to pursue "Rights of Action" as that language could be construed to prevent the Creditors' Committee from prosecuting the Complaint. The Creditors' Committee also opposed language that granted releases to the Released Parties.

Counsel for E. Roger Clark, Dana Beyeler, Maurice J. Cashman, and Robert J. Kaemmerer, who are named as Debtors' management and key employees ("Key Employees") in the Amended Disclosure Statement and are also named as individual Defendants to the Complaint (collectively the "Individual Defendants") asserted at the Confirmation Hearing that all parties should follow the Amended Plan; that all "Rights of Action" should vest with the reorganized debtor (Liquidating NFC); that the Responsible Officer should be placed in charge (subsequently identified as Maurice J. Cashman and Robert J. Kaemmerer); and that if any party was not satisfied with the performance of the Responsible Officer, that party could seek court authority to take appropriate action.

Debtor asserted that the Creditors' Committee lacks standing to bring the Complaint; that the Debtor is the only party authorized to bring such a cause of action. Debtor agreed to remove the contested release provisions from the Amended Plan.

To resolve outstanding objections to confirmation, the parties agreed to add the following language to the Confirmation Order:

3. Notwithstanding Article XII of the Plan, nothing in the Plan shall prejudice the rights of NFC, Components, Liquidating NFC, the Committees, the Banks, and any other parties in interest from asserting their respective positions regarding the authority, or lack thereof, of one or both of the Committees to file and prosecute the adversary proceeding captioned Official Committee of Unsecured Creditors of National Forge Company v. E. Roger Clark, et al, docketed at Adversary Proceeding No. 03–1014 (the "Committee Complaint"). No party to the Committee Complaint shall be required to file a responsive pleading until thirty (30) days after the entry of a Final Order authorizing the Creditors' Committee and/or the Retirees' Committee to proceed with the Committee Complaint.

4. In connection with the Banks' assertion of Claims against NFC, Components, and/or Liquidating NFC arising out of their defense of the Committee Complaint, NFC and Components shall

set aside $450,000, in a separate reserve, for the payment of any such Claims by the Banks that may ultimately be allowed.

As discussed at the confirmation hearing, the Creditors' Committee filed the within Motion to address the issue of its authority to bring the Complaint.

### Assertions

The Creditors' Committee asserts that the language of the Final DIP Order and the five successive Stipulations for extension of the Due Diligence Deadline gave it the authority needed to file the Complaint and, if not, then the Court, pursuant to 11 U.S.C. § 105, § 1103 and § 1109, should grant authority to the Creditors' Committee to prosecute the colorable fraudulent conveyance claims that it has set forth for the benefit of the bankruptcy estate *nunc pro tunc* to the date of the filing of the Complaint, January 31, 2003.

Debtor responds that the Creditors' Committee lacked authority to file the Complaint; that the Complaint has no merit; and that the Complaint exposes Debtor's estate to substantial indemnification claims with little or no prospect of recovery.

The Banks respond that the Creditors' Committee lacked standing to file the Complaint; that even if standing could be granted, it was not sought prior to the January 31, 2003 deadline for the filing of a Complaint against the Banks and the Creditors' Committee should be forever barred from bringing the action; and that the Complaint fails to allege a colorable claim against the Banks.

The Individual Defendants respond that the Creditors' Committee failed to follow proper procedures to obtain authority to file the Complaint; that nothing in the Final DIP Order or subsequent Stipula-

tions mentions the Individual Defendants; that the filing of the Complaint was a violation of the automatic stay provisions of 11 U.S.C. § 362; that there is no reason why the Creditors' Committee is entitled to *nunc pro tunc* relief; that the Creditors' Committee should be judicially estopped from bring the Complaint since it failed to object to language which vested the right to bring such action in Liquidating NFC and since there was no mention of litigation in the Amended Disclosure Statement or Amended Plan; that the commencement of such litigation constitutes a material change in the terms of the Amended Plan and reballoting is required; that the Creditors' Committee is barred by confirmation of the Amended Plan which vests authority to bring such action in Liquidating NFC; and that the Creditors' Committee fails to state a colorable cause of action. The remaining defendants to the Complaint join the position of the Individual Defendants.

### Discussion

█ "The ability to avoid fraudulent or preferential transfers and recover other property rights for the benefit of the estate is often an integral part of a debtor's attempts to reorganize." *In re iPCS, Inc.,* 297 B.R. 283, 287 (Bankr.N.D.Ga.2003). Under § 1107, the Bankruptcy Code vests the power to bring avoidance actions with the debtor-in-possession. *Id.* "[B]ankruptcy Courts can authorize creditors' committees to sue derivatively to avoid fraudulent transfers for the benefit of the estate." *Cybergenics,* 330 F.3d at 580.

█ In *Cybergenics,* the Creditors' Committee petitioned the Debtor to bring the lawsuit and the Debtor declined. The opponents of the Creditors' Committee's Motion here argue that such a request by the Creditors' Committee to the Debtor is a prerequisite to the Committee's Motion.

Here, the Committee filed the lawsuit and now seeks authority to pursue it.

The parties in interest who oppose granting the Creditors' Committee the authority to pursue the claims set forth in the Complaint are parties who will be defendants in the lawsuit. Some of those defendants are the same Key Employees who will also control Liquidating NFC. They clearly have interests potentially at odds with the Debtor's creditors. If any of those parties would agree to the Committee's request, they would not appear here in strident opposition. Such a request by the Committee would have been futile.

Even the Debtor, which is not named as a defendant, has appeared and filed opposition to the Motion. Debtor seemingly takes inconsistent positions. In response to the Creditors' Committee's objection to the Disclosure Statement that it failed to disclose that the cause of action raised in the Complaint may exist, Debtor posited that such action was property of Holdings and would not be affected by the Plan. In the face of Debtor's opposition, it cannot be said that a formal request, in order to obtain a formal refusal, a request which would surely be refused, should be required.

■ As to the Banks, the Debtor waived all rights it had to contest the Banks' claims at the beginning of the case by language in the Interim and Final DIP Orders. The Creditors' Committee was charged with the task of investigating the legitimacy of the Banks' claims and pursuit of any cause of action that might be brought against the Banks. The language of those Orders and the subsequent Stipulations put the Banks on notice that the Creditors' Committee was investigating the Redemption Transaction. The prior Orders provide sufficient authority for the filing of the Complaint as against the Banks.

■ The Creditors' Committee asserts that in March, 1999, the controlling Class B shareholders implemented a shareholder reorganization under which the Debtor corporation redeemed the shares of Class B stock in the Debtor at unjustified prices. The $5.7 million which was needed in order to redeem the controlling shareholders' stock was not fully available and $4 million was borrowed from the Banks. The Banks were aware that the loan was being used to fund the redemption and the loan was secured by liens on the Debtor's assets. Within three years, on March 6, 2002, the Debtor was forced to file bankruptcy under Chapter 11. The Creditors' Committee asserts that the Debtor was insolvent when the stock redemption was accomplished, or was rendered insolvent thereby, thus creating fraudulent transfer claims against the Banks and certain transferees and breach of fiduciary duty claims against the Debtor's officers. The above bare-bones facts state, at least, a colorable claim. While there may be adequate defenses which come to light when answers to the Complaint are filed, the claim in its present form is colorable.

■ Debtors' management has a conflict of interest in pursuing the fraudulent conveyance action. Key Employees received a benefit from the Redemption Transaction and are named as the Individual Defendants to the Complaint. The Creditors' Committee is the only appropriate party to pursue the cause of action.

■ Many of the issues could have been avoided if the Creditors' Committee had sought Court approval to bring the action before the filing of the Complaint. Absent, *nunc pro tunc* relief, a dismissal would surely be followed by a new adversary Complaint against the Individual

Defendants. *Nunc pro tunc* relief is appropriate in the present Adversary Proceeding as dismissing it for failure to seek prior approval would be inefficient. *See In re Valley Media, Inc.*, 2003 WL 21956410 (Bankr.D.Del., August 14, 2003).

■ There is no risk that the Creditors' Committee is usurping the Debtor's role in bringing the Complaint. The Court has had ample opportunity to serve the role as "gatekeeper" in this case to weigh the potential benefit of the litigation against the costs that might be incurred. Any funds that the Creditors' Committee expends in pursuit of the Complaint are funds that would otherwise be available for distribution to its constituents. The incurrence of costs and fees of prosecution has no effect on any other party in the case.

■ There is no merit to the assertions that the Creditors' Committee is prevented from pursuing the Complaint on the basis of Judicial Estoppel or that it is barred by the provisions of the Confirmed Amended Plan. This cause of action was contemplated for a significant portion of the duration of the case. The language of the Amended Plan made it crystal clear that all transactions with the Debtor would be subject to scrutiny and potential action. At one point, it appeared that unsecured creditors could receive up to a 95% dividend on their claims, and, if so, the Creditors' Committee might have foregone the pursuit of the cause of action. It turns out that the dividend is much less. All parties were aware of the possibility of the filing of the Complaint. Debtor attempted to protect the Banks and its Key Employees who are also the Individual Defendants by including inappropriate releases in the Amended Plan, which it removed after the Court

advised that the Amended Plan could not be confirmed with the inappropriate release language. Debtor further stated that this cause of action is property of Holdings and is not affected by the Amended Plan.[3]

The order of confirmation of the Amended Plan specifically states that nothing in the Plan infringes upon the Creditors' Committee's right to go forward with this Complaint.

### Conclusion

For all of the foregoing reasons, it is appropriate to grant the Creditors' Committee the authority to assert, pursue and/or settle claims raised in the Complaint filed by the Creditors' Committee *nunc pro tunc* to January 31, 2003.

---

**3.** Debtor has subsequently sought to dismiss the Holdings case. The motion to dismiss remains pending and will be refused by separate order subject to final resolution of the within Complaint.